NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

FEDERAL LABOR RELATIONS AUTHORITY, Respondent,

National Labor Relations Board Union, Intervenor.

No. 91–1608.

United States Court of Appeals, District of Columbia Circuit.

Argued March 2, 1993.

Decided Aug. 31, 1993.

Robert M. Loeb, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause for petitioner. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., and William Kanter, Atty., U.S. Dept. of Justice, Washington, DC.

Wendy B. Bader, Attorney, Federal Labor Relations Authority ("FLRA"), Washington, DC, argued the cause for respondent. With her on the brief were David M. Smith, Sol., and Arthur A. Horowitz, Associate Sol., FLRA, Washington, DC. William E. Persina and Pamela P. Johnson, Attys., FLRA, Washington, DC, also entered appearances for respondent.

Joseph V. Kaplan, Silver Spring, MD, entered an appearance for intervenor N.L.R.B. Union.

Before MIKVA, Chief Judge, and WALD and BUCKLEY, Circuit Judges.

Opinion PER CURIAM.

Opinion dissenting in part filed by Circuit Judge BUCKLEY.

PER CURIAM:

The National Labor Relations Board petitions for review of a decision and order of the Federal Labor Relations Authority requiring that the NLRB bargain over a proposal advanced by the National Labor Relations Board Union. The FLRA determined that the proposal, which would require the NLRB to change the manner in which it conducts employee performance appraisals, was negotiable as an "appropriate arrangement[ ] for employees adversely affected by the exercise of" management rights. Because we find that the proposal is not sufficiently tailored to redress the harms suffered by the particular employees who are in fact adversely affected by the performance appraisal process, we grant the petition for review and deny the FLRA's cross-petition for enforcement of its order.

## I. BACKGROUND

### A. Legal Framework

This case arises under Title VII of the Civil Service Reform Act of 1978, commonly known as the Federal Service Labor Management Relations Statute ("Statute"). 5 U.S.C. §§ 7101–35 (1988). The Statute confers on federal employees the right "to engage in collective bargaining with respect to conditions of employment through representatives chosen by [the] employees." Id. § 7102(2). To effectuate this right, the Statute requires each agency to "negotiate in good faith" with the exclusive representative of its employees "for the purpose[ ] of arriving at a collective bargaining agreement." Id. § 7114(a)(4).

The range of subjects over which agencies are required to bargain is not unlimited. In particular, 5 U.S.C. § 7106 establishes certain "management rights" that are exempt from the negotiation process. In relevant part, that section provides:

(a) Subject to subsection (b) of this section, nothing in this chapter shall affect the authority of any management official of any agency—

. . . .

(2) in accordance with applicable laws—

(A) to hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees;

(B) to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted;

. . . .

(b) Nothing in this section shall preclude any agency and any labor organization from negotiating—

. . . .

(3) appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials.

Id. § 7106(a), (b).

To assess whether proposals impinging upon management rights under section 7106(a) should nonetheless be considered negotiable under section 7106(b)(3) as appropriate arrangements for adversely affected employees, the FLRA has, since 1986, applied the two-part test articulated in National Association of Government Employees, Local R14–87 and Kansas Army National Guard, 21 F.L.R.A. 24 (1986) ("KANG"). Under the KANG test, which was developed in response to this court's decision in American Federation of Government Employees, Local 2782 v. FLRA, 702 F.2d 1183 (D.C.Cir.1983) ("Local 2782"), "the Authority will first examine the record in each case to ascertain as a threshold question whether a proposal is in fact intended to be an arrangement for employees adversely affected by management's exercise of its rights." KANG, 21 F.L.R.A. at 31. At this stage, the burden is on the union to "articulate how employees will be detrimentally affected by management's actions and how the matter proposed for bargaining is intended to address or compensate for the actual or anticipated adverse effects

of the exercise of the management right or rights." *Id.*

Assuming that the proposal qualifies as an "arrangement," the second step is for the FLRA to evaluate whether the arrangement "is inappropriate because it excessively interferes" with the exercise of management's rights. *Id.* This is accomplished "by weighing the competing practical needs of employees and managers," *id.* at 31–32, an open-ended balancing analysis that may include consideration of such factors as "the nature and extent of the impact experienced by the adversely affected employees" and "the nature and extent of the impact on management's ability to deliberate and act pursuant to its statutory rights." *Id.* at 32–33; *see generally Overseas Educ. Ass'n, Inc. v. FLRA,* 961 F.2d 36, 39–40 (2d Cir.1992) (holding that the excessive interference prong of the *KANG* test constitutes a reasonable interpretation of the term "appropriate" in section 7106(b)(3)).

## B. The Facts and the FLRA's Decision

The present dispute has its origins in a change in the NLRB's approach to conducting performance appraisals of professional and clerical employees in its field offices. Under the "old" system, an employee's immediate supervisor would prepare a written appraisal discussing the employee's performance and recommending specific ratings for each critical and noncritical element of the employee's position. The supervisor would then meet with the employee to discuss the appraisal. Thereafter, the supervisor would forward his evaluation to higher-level officials in the regional office, each of whom would supply comments and an assessment of the employee's performance. Next, the appraisals would be reviewed by the regional director, who would also provide an evaluation of the employee. The employee would then receive copies of the various assessments and have an opportunity to comment on them before they were finalized and sent to the Board's D.C. headquarters.

Under the "new" review process, the appraising officials and the regional director meet in advance to determine the performance rating each employee will receive.

Once the regional director, who is now the sole "reviewing official," determines the outcome of the appraisal, a written report is prepared and furnished to the employee in "one voice"; that is, without dissenting opinions.

During collective bargaining negotiations with the NLRB, the Union sought to open up the Board's performance appraisal process. Specifically, it made the following proposal:

(1) An employee's appraising official(s) shall prepare in writing an independent evaluation of an employee's performance and recommend specific performance standard ratings on each of the employee's critical and, as applicable, noncritical elements, and forward the same to the employee's designated reviewing official(s). Such evaluation will not contain a summary rating nor constitute a rating of record.

(2) *Option 1.* An employee's appraising official(s) shall provide a copy of an employee's evaluation and recommendations to the employee and discuss it with the employee before the appraising official(s) forwards the same to the appropriate reviewing official(s) for further action.

*Option 2.* [note—to be considered only if option 1 is determined to violate 5 C.F.R. § 430.206(c) ].

Once an employee's reviewing official(s) has (have) acted upon the written evaluation of performance and recommendations by the employee's appraising official(s), derived a summary rating, and conferred a rating of record, the employee shall be provided copies of the appraisal documents prepared by the appraising and reviewing officials.

Joint Appendix ("J.A.") at 6.

The NLRB refused to bargain over the Union proposal on the ground that it impermissibly infringed upon the rights reserved to management under 5 U.S.C. § 7106(a). The NLRB also claimed that the proposal was inconsistent with 5 C.F.R. § 430.206(c) (1993), which provides in relevant part:

(c) *Higher level review.* Ratings of record and performance-based personnel actions shall be reviewed and approved by a

person(s) at a higher level in the organization than that of the appraising official. Ratings of record may not be communicated to employees prior to approval by the final reviewer. This does not preclude communication about appraisal of performance between a supervisor and an employee prior to the determination of the rating of record. Ratings of record must be approved by the official with the responsibility for managing the performance awards budget within the agency.

5 C.F.R. § 430.206(c); *see* 5 U.S.C. § 7117(a) (indicating that the obligation to bargain does not extend to matters that are "inconsistent with any Federal law or any Government-wide rule or regulation").

The Union appealed to the FLRA for review of the NLRB's refusal to negotiate. In a decision and order issued on October 31, 1991, the FLRA agreed with the NLRB that Option 1 of section (2) was non-negotiable because it was inconsistent with the 5 C.F.R. § 430.206(c) prohibition on communicating an employee's rating of record "prior to approval by the final reviewer." *See National Labor Relations Bd. Union and National Labor Relations Bd.*, 42 F.L.R.A. 1305, 1306, 1322–23 (1991). The FLRA found, however, that the remainder of the proposal was both consistent with the regulation and negotiable. *See id.* at 1317–22, 1323–24.

Turning first to section (1) of the proposal, the FLRA determined that it would directly interfere with management's rights to direct employees and assign work by impinging upon the NLRB's internal deliberations concerning employee appraisals. *See id.* at 1318–19. In particular, section (1) would "prevent an appraising official from discussing the 'independent evaluation' ... with the reviewing official prior to it being forwarded to that official." *Id.* at 1319. The Authority concluded, however, that section (1) was negotiable as an appropriate arrangement for adversely affected employees under section 7106(b)(3). *See id.* at 1320–21. Applying the first part of the *KANG* test, the Authority found that section (1) was an arrangement because it was "intended to ensure that employees, whose careers could be adversely affected depending on the evaluation they

receive, will be evaluated objectively and fairly by Agency officials performing that function." *Id.* at 1320. Next, the Authority determined that the section (1) arrangement did not excessively interfere with the exercise of management rights. *See id.* at 1320–21. According to the FLRA, the proposal would prevent appraising officials from "tailoring" their initial evaluations to comport with the views of the regional director, thereby promising a significant benefit to employees in terms of more objective performance reviews. *See id.* This benefit outweighed what the FLRA characterized as the "minimal" impact on management rights. *Id.* at 1321. The Authority explained:

> [A]lthough this section prevents initial discussions between the appraising official and the reviewing official, it would not preclude management from discussing the appraising official's "independent evaluation" with that official after receipt of the document and prior to any final action. Management would still be able to engage in internal deliberations and could, after doing so, reach a different assessment of the employee's performance.

*Id.*

Moving to the second option in section (2), the FLRA found that Option 2 would "in no way restrict[ ]" the exercise of management rights. *Id.* at 1324. The Authority reasoned that management's deliberative process would not be impaired by the disclosure of information after final performance ratings had been assigned. *Id.*

The NLRB now petitions for review of the FLRA's negotiability ruling pursuant to 5 U.S.C. § 7123(a). The FLRA has cross-petitioned for enforcement of its order, *see id.* § 7123(b), and the Union has intervened on the side of the Authority.

## II. DISCUSSION

The NLRB challenges the FLRA's conclusion that the Union's proposal qualifies as an appropriate arrangement for adversely affected employees. The Board argues both that the proposal is inadequately tailored to address only the problems of those employees who are adversely affected, and that it

excessively interferes with management rights. The Board also renews its argument that the proposal is inconsistent with 5 C.F.R. § 430.206(c). As we conclude that the proposal is far too broad to qualify as an arrangement, we need not reach the questions whether it excessively interferes with management rights or conflicts with the regulation.

## A. Jurisdiction

Before addressing the merits, we must first confront a thorny jurisdictional problem. Section 7123(c) of the Statute provides:

No objection that has not been urged before the Authority, or its designee, shall be considered by the court, unless the failure or neglect to urge the objection is excused because of extraordinary circumstances.

5 U.S.C. § 7123(c). The purpose of this provision is to ensure "that the FLRA shall pass upon issues arising under the [Statute], thereby bringing its expertise to bear on the resolution of those issues." *EEOC v. FLRA,* 476 U.S. 19, 23, 106 S.Ct. 1678, 1681, 90 L.Ed.2d 19 (1986) (per curiam); *see also United States Dep't of Housing & Urban Dev. v. FLRA,* 964 F.2d 1, 5 (D.C.Cir.1992) ("Section 7123 was designed to ensure that the Authority's expertise be used to dispose of all arguments relating to cases within its jurisdiction.").

In its brief, the FLRA argues that this court may not consider the NLRB's claim that section (1) of the proposal would excessively interfere with management rights because this objection was not raised before the Authority. Oddly, the FLRA passes up the opportunity to make precisely the same argument with respect to the NLRB's contention that section (1) fails to qualify as an arrangement. Section 7123(c) is, however, jurisdictional in nature, and hence this court has an obligation to raise the matter on its own. *See EEOC v. FLRA,* 476 U.S. at 23, 106 S.Ct. at 1681 (noting that "[s]ection 7123 speaks to courts, not parties" and finding that "§ 7123(c) ... is not 'waived' simply because the FLRA fails to invoke it"); *United States Dep't of Defense v. FLRA,* 982 F.2d 577, 579 (D.C.Cir.1993).

The possibility that the NLRB has waived its arguments concerning the status of the proposal as an appropriate arrangement arises from the manner in which the issue was presented to the FLRA. In its initial "Petition for Review of Agency Declaration of Nonnegotiability," the Union vaguely asserted that the proposal should be considered negotiable because it "reflect[s] procedures and ... [is] consistent with th[e] regulations." J.A. at 11. The NLRB responded with its "Statement of Position," in which it argued that the proposal was inconsistent with 5 C.F.R. § 430.206(c), and could not be considered negotiable under the 5 U.S.C. § 7106(b)(2) exception for "procedures which management officials ... will observe in exercising" their rights. In a brief reply, the Union reiterated its view that the proposal was consistent with the regulation and should be viewed as a section 7106(b)(2) procedure. In addition, the Union also suggested for the first time that the proposal qualified as an appropriate arrangement under section 7106(b)(3). As discussed above, the FLRA seized on this suggestion in its decision and order as the basis for its ruling that the proposal was negotiable.

In light of this procedural history, the NLRB appears to be correct in asserting that, at the time it presented its arguments to the Authority, there was "no cause or reason" to suspect that the appropriate arrangement issue would be considered. Reply Brief for the NLRB at 11. Nevertheless, the mere fact that the NLRB was to some degree "taken by surprise" does not by itself constitute an extraordinary circumstance excusing the NLRB's failure to object. Indeed, in a slew of cases applying section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e), a provision that is in relevant part identical to 5 U.S.C. § 7123(c), *see EEOC v. FLRA,* 476 U.S. at 23, 106 S.Ct. at 1681, courts have consistently held that when the NLRB raises and resolves an issue *sua sponte,* a party seeking judicial review of that issue must first file a motion for reconsideration with the Board. *See Woelke & Romero Framing, Inc. v. NLRB,* 456 U.S. 645, 665–66, 102 S.Ct. 2071, 2082–83, 72 L.Ed.2d 398 (1982); *International Ladies' Garment*

*Workers' Union v. Quality Mfg. Co.,* 420 U.S. 276, 281 n. 3, 95 S.Ct. 972, 975 n. 3, 43 L.Ed.2d 189 (1975); *NLRB v. International Bhd. of Elec. Workers, Local Union No. 453,* 730 F.2d 520, 524 (8th Cir.1984); *NLRB v. Allied Prod. Corp.,* 629 F.2d 1167, 1171–72 (6th Cir.1980); *see also Teamsters Local 115 v. NLRB,* 640 F.2d 392, 398 (D.C.Cir.1981) (stating that "mere sua sponte adoption of a remedy does not in itself amount to the 'extraordinary circumstances' required by the statute, because reconsideration is available at the Board level"). *But see EEOC v. FLRA,* 476 U.S. at 24, 106 S.Ct. at 1681 (suggesting in dicta that the Authority's decision to raise an issue *sua sponte* "might excuse the [agency's] failure to press [a] claim before the FLRA"). Given the similarity of the FLRA's and NLRB's motion for reconsideration provisions, *compare* 5 C.F.R. § 2429.17 (1993) (FLRA) *with* 29 C.F.R. § 102.48(d) (1992) (NLRB), these holdings should apply with equal force to FLRA proceedings. In the present case, however, the NLRB failed to file a motion for reconsideration, choosing instead to proceed directly to this court.

■ Notwithstanding the NLRB's failure to argue the appropriate arrangement issue in a motion for reconsideration, we conclude that we are not barred from considering the matter. In the years prior to the FLRA's decision in this case, the FLRA had adopted an approach to implementing the first part of the *KANG* test under which a proposal qualified as an arrangement if it was "intended" to prevent or ameliorate adverse effects that were a "reasonably foreseeable" result of the exercise of management rights. *National Fed'n of Federal Employees, Local 2096 and United States Dep't of the Navy, Naval Facilities Engineering Command, Western Division,* 36 F.L.R.A. 834, 841 (1990) (*"NFEC"*); *West Point Elementary Sch. Teachers Ass'n and United States Military Academy, West Point Elementary Sch.,* 34 F.L.R.A. 1008, 1013 (1990). In practice, this meant that as long as (1) the postulated adverse effects were not "purely speculative or hypothetical concerns," *NFEC,* 36 F.L.R.A. at 841 (quoting *American Fed'n of State, County and Mun. Employees, Local 3097 and Department of Justice,* 24 F.L.R.A.

453, 458 (1986) (Calhoun, dissenting)), and (2) there was a colorable claim that the proposal might prevent some employees from suffering the adverse effects, the proposal could stand as an arrangement, and the FLRA would proceed to evaluate whether it would excessively interfere with management rights. As a result, the FLRA repeatedly held negotiable prophylactic proposals that would apply broadly to management practices affecting all employees, including two proposals that we view as indistinguishable from the Union's proposal for purposes of ruling on the merits. *See American Fed'n of Gov't Employees and United States Dep't of the Interior Minerals Mgmt. Serv.,* 39 F.L.R.A. 1276, 1278 (1991), *rev'd,* 969 F.2d 1158 (D.C.Cir.1992); *American Fed'n of Gov't Employees and United States Dep't of Educ.,* 38 F.L.R.A. 1068, 1074, 1077–78 (1990), *reconsideration denied,* 39 F.L.R.A. 1241 (1991), *rev'd,* 969 F.2d 1158 (D.C.Cir.1992); *see also American Fed'n of Gov't Employees and United States Dep't of Educ.,* 42 F.L.R.A. 527, 528, 539–41 (1991); *United States Dep't of Transp., Fed. Aviation Admin. and Professional Airways Sys. Specialists,* 40 F.L.R.A. 690, 711–12 (1991), *remanded on other grounds,* 966 F.2d 702 (D.C.Cir. 1992).

Under these circumstances, it seems clear that the FLRA would have rejected a petition for rehearing challenging the determination that section (1) of the proposal qualified as an arrangement. Of course, the requirement that a litigant present such a petition is ordinarily not excused simply "because the [Authority] was unlikely to have granted it." *Van Dorn Plastic Machinery Co. v. NLRB,* 881 F.2d 302, 306 (6th Cir.1989) (applying 29 U.S.C. § 160(e)). But we find that, when combined with the "almost *sua sponte*" nature of the FLRA's decision on the appropriate arrangement issue, the patent futility of a rehearing petition constitutes an extraordinary circumstance that excuses the NLRB's failure to object. *Cf. United States Dep't of the Interior Minerals Mgmt. Serv. v. FLRA,* 969 F.2d 1158, 1161 (D.C.Cir.1992) (*"Minerals Management"*) (finding that notwithstanding agency's failure to object, court had jurisdiction to review FLRA ruling that pro-

posal qualified as appropriate arrangement because (1) the FLRA had raised matter *sua sponte*, and (2) motion for reconsideration "would have been futile given that the Authority had just found an identical proposal negotiable under § 7106(b)(3)").

## B. The Merits

 The Statute provides that the Authority's orders are to be reviewed in accordance with the standards established in the Administrative Procedure Act, 5 U.S.C. § 706. *See* 5 U.S.C. § 7123(c); *Bureau of Alcohol, Tobacco and Firearms v. FLRA*, 464 U.S. 89, 97 n. 7, 104 S.Ct. 439, 444 n. 7, 78 L.Ed.2d 195 (1983) ("*BATF* "). Thus, we must reverse the Authority's negotiability decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see BATF*, 464 U.S. at 97 n. 7, 104 S.Ct. at 444 n. 7. Moreover, because "the FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the [Civil Service Reform] Act," *id.* at 97, 104 S.Ct. at 444, the Authority's "interpretation of its Statute, if reasonable, is entitled to deference." *American Fed'n of Gov't Employees v. FLRA*, 798 F.2d 1525, 1528 (D.C.Cir.1986); *see also Department of the Treasury, Internal Revenue Serv. v. FLRA*, 494 U.S. 922, 928, 110 S.Ct. 1623, 1627, 108 L.Ed.2d 914 (1990); *see generally Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Still, the Supreme Court has made clear that courts "must not rubber-stamp ... [FLRA] decisions that they deem inconsistent with a statutory mandate." *BATF*, 464 U.S. at 97, 104 S.Ct. at 444 (quoting *NLRB v. Brown*, 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)). In the present case, the FLRA's ruling reflects an interpretation of section 7106(b)(3) that directly contravenes our recent decision in *Minerals Management*, which established that a proposal may qualify as an appropriate arrangement under section 7106(b)(3) "only when the [proposal] is tailored to benefit or compensate those employees suffering ... adverse effects." 969 F.2d at 1162.

In *Minerals Management,* we considered two separate proposals relating to drug testing programs that the FLRA had held negotiable as appropriate arrangements. Under the first proposal, the agency would have been required to "agree that the establishment and administration of its drug abuse testing program will be done in strict compliance with the U.S. Constitution and all applicable laws, rules and regulations and this collective bargaining agreement." *Id.* at 1160 (brackets omitted). The second proposal would have required the agency to "comply with its own regulations governing personnel policies and practices, and general conditions of employment whether such regulations are discretionary or mandatory and whether or not such regulations involve an exercise of a management right." *Id.* The court reversed the FLRA's ruling, finding that the proposals were too broad to qualify as arrangements for adversely affected employees. According to the court:

> [T]he plain language of § 7106(b)(3) demands that the FLRA assure that arrangements are tailored to redress only those employees adversely affected by a management action. Congress provided that unions could negotiate over "appropriate arrangements *for employees adversely affected* by the exercise" of a management prerogative. By this, Congress necessarily excluded arrangements not tailored to benefit the adversely affected.

*Id.* at 1162 (citations omitted; emphasis in original). The court then reasoned that the drug testing proposals failed to meet this standard because it was not clear that the rights they conferred "would be limited to employees who suffered adverse effects as foreseen by the Authority." *Id.; see also United States Dep't of Justice, Immigration and Naturalization Serv. v. FLRA*, 975 F.2d 218, 225–26 (5th Cir.1992) (following *Minerals Management* and holding a proposal nonnegotiable because it was "not tailored to benefit only those employees who would be adversely affected" by the agency's actions); *cf. Local 2782*, 702 F.2d at 1187 (observing that section 7106(b)(3) is "limited to 'employees adversely affected' as opposed to *all* employees") (emphasis in original).

As in *Minerals Management,* the proposal advanced by the Union in the present case is a prophylactic measure applicable to all employees, instead of being "tailored to benefit or compensate those employees suffering . . . adverse effects." *Minerals Management,* 969 F.2d at 1162. In particular, section (1) of the proposal requires that all employees receive an independent written evaluation by their appraising official. The FLRA's analysis of section (1), however, simply ignores this fact. Indeed, the Authority made no effort to discern "whether the balm provided by the proposal would be administered only to hurts arising from" the performance appraisal process. *Id.*

In an attempt to avoid the conclusion that this case is governed by *Minerals Management,* the FLRA relies heavily on *United States Department of the Treasury, Office of the Chief Counsel, Internal Revenue Service v. FLRA,* 960 F.2d 1068 (D.C.Cir.1992) ("*IRS*"). In that case, the union proposed that personnel evaluations would have to be provided to employees within forty-five days of their development. *See id.* at 1070 & n. 1. If evaluations were not furnished to employees within the forty-five day period, they could "not be used by the supervisor or by a ranking panel or official"; and any material they contained that might adversely affect an employee's appraisal or rating would have to be destroyed. *See id.* at 1070 n. 1. The court affirmed the FLRA's ruling that the proposal was negotiable as an appropriate arrangement under section 7106(b)(3). *See id.* at 1073. In reaching this result, the court rejected the agency's argument that because a given evaluation could be positive rather than negative, the proposal did not relate to adversely affected employees. Although the court acknowledged that "an adverse effect cannot be merely speculative," *id.* at 1071, it stated that

> we see nothing in the language of paragraph (b)(3) [of section 7106] that requires union proposals to target in advance the very individual employees who will be adversely affected. We think it sufficient that the Authority reasonably concluded

that evaluations will surely have adverse effects on some employees.
*Id.*

Admittedly, the first two aspects of the proposal in *IRS*—the requirement that evaluations be furnished to employees within forty-five days and the restriction on using such evaluations if not disclosed during that period—cannot be readily distinguished from section (1). By their terms, these provisions applied to all employees. Nevertheless, the *IRS* proposal was considered as a whole and included a remedy, the removal and destruction of any negative information relating to the employee, that was confined to those employees who were likely to be adversely affected. By contrast, there is no equivalent limitation in the present case. Indeed, to the extent that section (1) is supplemented by Option 2, the principal remedy here is the disclosure of the independent evaluations to all employees, not just to those who receive negative appraisals.

Given our conclusion that section (1) is not negotiable and the fact that Option 2 cannot stand independently of section (1), we need not address the parties' separate arguments regarding the negotiability of Option 2.

### III. CONCLUSION

Because the Union's proposal is not tailored to redress the harms suffered by employees who are in fact adversely affected by the NLRB's appraisal process, it may not qualify as an appropriate arrangement for adversely affected employees. Accordingly, we grant the NLRB's petition for review and deny the FLRA's cross-petition for enforcement.

*So ordered.*

BUCKLEY, Circuit Judge, dissenting in part:

In my view, we are without jurisdiction to reach the merits of the appropriate arrangements question. I write separately to express my concern that the court's opinion represents an imprudent, albeit small, expansion of the "extraordinary circumstances" exception to the requirement that "[n]o objection that has not been urged before the

Authority ... shall be considered by the court." 5 U.S.C. § 7123(c).

As the court acknowledges, neither the "almost *sua sponte*" nature of the FLRA's ruling on the appropriate arrangement issue nor the apparent futility of challenging that ruling is, by itself, sufficient to excuse the NLRB's failure to object. It is true that the NLRB did not have notice that the appropriate arrangement issue would be considered when it initially presented its arguments to the FLRA. But the Board was put on notice when the Authority rendered its decision, and yet it failed to file a motion for reconsideration.

With respect to futility, finding that an extraordinary circumstance exists simply because an objection is likely to be rejected is hardly consonant with the plain meaning of the word "extraordinary." Moreover, the futility concept is inherently susceptible of expansive applications. For that reason, it threatens to undermine the purposes of section 7123(c), which are to preserve the FLRA's role as the primary adjudicator in public sector labor disputes and to conserve judicial resources by requiring that litigants raise arguments before the FLRA that might induce the Authority to change its course without judicial intervention. Accordingly, futility should be viewed as an extraordinary circumstance only in extreme situations, as when an agency is bound by court precedent to adhere to a particular position, *see NLRB v. Robin American Corp.*, 667 F.2d 1170, 1171 (5th Cir.1982), or when an agency has steadfastly refused to acquiesce in judicial mandates, *see Kitchen Fresh, Inc. v. NLRB*, 716 F.2d 351, 357–58 & n. 13 (6th Cir.1983). No such situation is presented here.

The court nevertheless concludes that, although these two considerations are by themselves inadequate to give rise to an extraordinary circumstance, they add up to such a circumstance when taken together. I recognize that we found this type of synergy to exist in *United States Department of the Interior, Minerals Management Service v. FLRA*, 969 F.2d 1158, 1161 (D.C.Cir.1992).

But *Minerals Management* presented a truly unique situation that is readily distinguished. In that case, the court determined that a motion for reconsideration was excused because the FLRA had raised an issue *sua sponte* and recently denied a rehearing petition in a case involving an identical bargaining proposal. *See id.* Here, by contrast, the Authority's prior decisions in analogous cases do indicate that a petition for reconsideration by the NLRB would have been an uphill struggle; but the FLRA had not previously ruled on a proposal identical to the one set forth by the Union. To be sure, expanding the *Minerals Management* holding to the present context is a small step; but it is a step in the wrong direction that I am unwilling to take. The principle embodied in section 7123(c) is an important one and should be protected from erosion by successive expansions of the "extraordinary circumstances" exception, however small each might be.

Finally, I cannot help but note the lack of an institutional perspective inherent in the NLRB's argument that we should excuse its failure to comply with the requirements of section 7123(c). As the court notes, section 7123(c) is "virtually identical" to section 10(e) of the National Labor Relations Act, 29 U.S.C. § 160(e). *EEOC v. FLRA*, 476 U.S. 19, 23, 106 S.Ct. 1678, 1680, 90 L.Ed.2d 19 (1986). Accordingly, it is entirely possible that parties will in the future seek to exploit the court's holding today in an attempt to circumvent the NLRB's own adjudicatory authority.

I do not reach the merits of the appropriate arrangements issue because I believe that neither I nor my colleagues are empowered to do so.